**No. 17-15589**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF HAWAII; ISMAIL ELSHIKH,

*Plaintiffs – Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF STATE; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; REX W. TILLERSON, in his official capacity as Secretary of State; UNITED STATES OF AMERICA,

*Defendants – Appellants*.

On Appeal from the United States District Court
for the District of Hawaii
(1:17-cv-00050-DKW-KSC)

# MOTION OF DEFENDANTS-APPELLANTS FOR A STAY PENDING EXPEDITED APPEAL

JEFFREY B. WALL
*Acting Solicitor General*

EDWIN S. KNEEDLER
*Deputy Solicitor General*

CHAD A. READLER
*Acting Assistant Attorney General*

ELLIOT ENOKI
*Acting United States Attorney*

AUGUST E. FLENTJE
*Special Counsel to the Assistant Attorney General*

DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
ANNE MURPHY
*Attorneys, Appellate Staff*
*Civil Division, Room 7241*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. The Balance Of Harms Weighs Strongly In Favor Of A Stay .......... 3

A. The District Court's Injunction Imposes Serious, Irreparable Harm On The Government And The Public .......... 3

B. A Brief Stay Pending An Expedited Appeal Would Not Impose Any Substantial Harm On These Plaintiffs .......... 10

II. The Government Is Likely To Prevail On The Merits .......... 15

III. The Nationwide Injunction Is Improper .......... 19

CONCLUSION .......... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Wright*,
468 U.S. 737 (1984) ........ 11, 12

*An Na Peng v. Holder*,
673 F.3d 1248 (9th Cir. 2012) ........ 16

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
950 F.2d 1401 (9th Cir. 1991) ........ 22

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........ 23, 24

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........ 20

*Clapper v. Amnesty Int'l USA*,
133 S. Ct. 1138 (2013) ........ 13

*Dep't of the Navy v. Egan*,
484 U.S. 518 (1988) ........ 8

*DKT Mem'l Fund v. Agency for Int'l Dev.*,
887 F.2d 275 (D.C. Cir. 1989) ........ 14

*Fiallo v. Bell*,
430 U.S. 787 (1977) ........ 16

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........ 19

*Haig v. Agee*,
453 U.S. 280 (1981) ........ 7

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ........ 2

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Holder v. Humanitarian Law Project (HLP)*,
561 U.S. 1 (2010).......................................................................... 7-8

*In re Navy Chaplaincy*,
534 F.3d 756 (D.C. Cir. 2008)............................................................ 11, 12

*INS v. Legalization Assistance Project*,
510 U.S. 1301 (1993) (O’Connor, J., in chambers) .....................................10

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)........................................................................ 14, 15, 16

*Kowalski v. Tesmer*,
543 U.S. 125 (2004)..............................................................................13

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
941 F.2d 970 (9th Cir. 1991) ..................................................................21

*Landon v. Plasencia*,
459 U.S. 21 (1982)........................................................................... 1-2

*Lewis v. Casey*,
518 U.S. 343 (1996)..............................................................................20

*Lexmark Int’l, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377 (2014)..........................................................................13

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..............................................................................13

*Madsen v. Women’s Health Ctr., Inc.*,
512 U.S. 753 (1994)..............................................................................20

*Maryland v. King*,
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .....................................10

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*McCollum v. California Dep't of Corr. & Rehab.*,
647 F.3d 870 (9th Cir. 2011) .......................................................................14

*McCormack v. Hiedeman*,
694 F.3d 1004 (9th Cir. 2012) .....................................................................21

*McCreary County v. ACLU*,
545 U.S. 844 (2005)............................................................................. 17, 18

*Meinhold v. U.S. Dep't of Defense*,
34 F.3d 1469 (9th Cir. 1994) .......................................................................21

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1867) .......................................................................19

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977) (Rehnquist, J., in chambers) .....................................10

*Newdow v. Lefevre*,
598 F.3d 638 (9th Cir. 2010) ................................................................ 11, 12

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982).......................................................................................10

*Nken v. Holder*,
556 U.S. 418 (2009).........................................................................................2

*Reno v. American-Arab Anti-Discrimination Committee* (*AAADC*),
525 U.S. 471 (1999).................................................................................. 9, 17

*Sale v. Haitian Ctrs. Council, Inc.*,
509 U.S. 155 (1993)..........................................................................................9

*Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*,
641 F.3d 197 (6th Cir. 2011) (en banc) ........................................................14

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ............................................................... 21, 23

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*U.S. Dep't of Defense v. Meinhold*,
510 U.S. 939 (1993)....................19

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950)....................9

*United States v. Chem. Found., Inc.*,
272 U.S. 1 (1926)....................18

*United States v. Salerno*,
481 U.S. 739 (1987)....................19

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990)....................14

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981)....................21

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982).................... 11, 12

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) .................... 1, 8, 12, 14, 16, 23

*Washington v. Trump*,
No. 17-35105, slip op. (9th Cir. Mar. 17, 2017)
(dissent from the denial of rehearing *en banc*).................... 9, 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....................9

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
135 S. Ct. 2076 (2015)....................9

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

### Statutes

8 U.S.C. § 1101(a)(42) .......... 6

8 U.S.C. § 1157 .......... 6

8 U.S.C. § 1182(a)(7)(B)(iv) .......... 4

8 U.S.C. § 1182(f) .......... 4

8 U.S.C. § 1185(a)(1) .......... 4

8 U.S.C. § 1187 .......... 4

8 U.S.C. § 1187(a)(12)(A)(i) .......... 5, 17

8 U.S.C. § 1187(a)(12)(A)(ii) .......... 5, 17

8 U.S.C. § 1187(a)(12)(D)(i) .......... 5, 17

8 U.S.C. § 1187(a)(12)(D)(ii) .......... 5, 17

### Executive Orders

Executive Order No. 13,769 (Jan. 27, 2017) (Revoked Order) .......... 1

Executive Order No. 13,780 (Mar. 6, 2017),
82 Fed. Reg. 13,209 (Mar. 9, 2017) .......... 1

Order § 1(a) .......... 4

Order § 1(b)(i) .......... 4, 5

Order § 1(b)(iii) .......... 6

Order § 1(d) .......... 4, 5, 8, 17, 22

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Order § 1(e) ... 4, 5, 8
Order § 1(f) ... 4, 6, 8
Order § 1(h) ... 4, 6-7, 8
Order § 1(i) ... 8
Order § 2 ... 1, 2, 3, 10, 13, 15, 18, 19, 20, 21, 22, 23, 24
Order § 2(a) ... 4, 6, 22
Order § 2(b) ... 4, 6, 22
Order § 2(c) ... 4, 5, 12, 13, 14, 17
Order § 2(d) ... 22
Order § 2(e) ... 22
Order § 2(f) ... 22
Order § 2(g) ... 22
Order § 3(a)(i) ... 6
Order § 3(b)(i) ... 6
Order § 3(c) ... 6
Order § 6 ... 1, 2, 3, 10, 13, 14, 15, 18, 19, 20, 21, 22, 23, 24
Order § 6(a) ... 4. 6, 7, 22
Order § 6(b) ... 7, 22
Order § 6(c) ... 7

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Order § 6(d) ....................22

Order § 12(e)....................7

Order § 15(a)....................24

**Other Authorities**

U.S. Dep't of State, *Country Reports on Terrorism 2015* (June 2016)....................4

https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program....................5

## INTRODUCTION

The decision below is extraordinary: it enjoins nationwide an action taken by the President of the United States at the height of his powers. Exercising his constitutional and express statutory authority, the President issued Executive Order No. 13,780 (Mar. 6, 2017) (Order). Sections 2 and 6 of that Order direct a review of the Nation's procedures for screening and vetting aliens seeking entry. To facilitate that review, Section 2 temporarily suspends entry of foreign nationals from six countries (Iran, Syria, Sudan, Libya, Somalia, and Yemen) that present heightened terrorism-related risks, subject to case-by-case waivers for undue hardship. Section 6 temporarily suspends adjudication of refugee applications and travel of refugees to the United States, and adopts a lower annual limit on the number of refugees admitted. Those brief suspensions fall squarely within the Executive's historical authority over national security, foreign relations, and immigration.

The district court rested its decision in part on this Court's previous decision in *Washington v. Trump*, 847 F.3d 1151, 1167 (2017). There, after this Court declined to stay an injunction against the predecessor Executive Order No. 13,769 (Jan. 27, 2017) (Revoked Order), the President promptly revised it. The present Order no longer even arguably presents any due-process concerns: it affects only foreign nationals who are outside the United States and lack a visa—individuals who "ha[ve] no constitutional rights regarding" their admission. *Landon v. Plasencia*,

459 U.S. 21, 32 (1982). The Order thus represents the President's good-faith effort to accommodate this Court's concerns while fulfilling his duty to protect the Nation. The district court nevertheless enjoined Sections 2 and 6 under the Establishment Clause—even though their text and operation have nothing to do with religion—based primarily on campaign statements by the President and comments by advisors.

All of the traditional factors favor a stay of that injunction pending expedited appeal. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The balance of harms tips sharply toward a stay: barring effectuation of the President's judgment that Sections 2 and 6 are warranted to protect the Nation's safety threatens the interests of the government and the public (which merge here, *Nken v. Holder*, 556 U.S. 418, 435 (2009)). By contrast, plaintiffs have identified no meaningful and irreparable injury that they personally would incur during the brief period of an expedited appeal from the Order's 90-day suspension of entry for certain foreign nationals from six countries—let alone from other enjoined provisions that plaintiffs barely mentioned below, including the annual cap on refugees, refugee suspension, and internal-review provisions. The government also has a strong likelihood of success on the merits of plaintiffs' claims.

Accordingly, this Court should stay the district court's injunction in its entirety pending final disposition of the appeal of that injunction's validity and scope. At a minimum, however, a partial stay is appropriate because the district

court's nationwide injunction is vastly overbroad. Article III and principles of equity require more tailored relief: the provisions of Sections 2 and 6 concerning internal governmental or diplomatic activities, and those relating to refugees, should not be blocked because they plainly do not harm plaintiffs; indeed, plaintiffs never specifically challenged the refugee cap. And none of the provisions of Sections 2 and 6 should be enjoined nationwide, because that sweeping remedy is unnecessary to provide complete relief to these plaintiffs. For those reasons, the government respectfully requests that this Court enter a stay pending this expedited appeal.

## ARGUMENT

### I. The Balance Of Harms Weighs Strongly In Favor Of A Stay

#### A. The District Court's Injunction Imposes Serious, Irreparable Harm On The Government And The Public

A district court has set aside the President's considered judgment about how to protect the Nation. It did so notwithstanding that the President's Order was authorized under Acts of Congress; was informed by the advice of the Cabinet officials responsible for legal, national security, and immigration matters; drew on earlier steps by Congress and the Executive identifying the designated countries as posing heightened terrorism risks; and responded to potential due-process concerns that this Court identified in the earlier Revoked Order.

**1.** Consistent with the President's broad constitutional authority over foreign affairs and national security, Congress expressly authorized the President to

restrict or suspend entry of any class of aliens whenever he finds that such entry would be detrimental to the interests of the country. 8 U.S.C. §§ 1182(f), 1185(a)(1).

The President exercised that authority here, in consultation with the Secretary of Homeland Security and the Attorney General, to address a national-security risk. In light of evidence that "some of those who have entered the United States through our immigration system have proved to be threats to our national security," the President determined that it was necessary to conduct an immediate review of the adequacy of the Nation's screening and vetting procedures to detect terrorists and identify threats to national security. Order §§ 1(h), 2(a)-(b), 6(a).

To facilitate that important review, the President ordered a temporary pause on entry of nationals from six countries that had previously been "identified as presenting heightened concerns about terrorism and travel to the United States" by Congress or the Executive in the context of the Visa Waiver Program. Order §§ 1(a), (b)(i), (d)-(f), 2(c). Congress created that Program to enable nationals of participating countries to seek temporary admission without a visa. 8 U.S.C. §§ 1182(a)(7)(B)(iv), 1187. Congress subsequently excluded from travel under the Program dual nationals of or recent visitors to Iraq and Syria—where "[t]he Islamic State of Iraq and the Levant (ISIL) * * * maintain[s] a formidable force," U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 6, 299-302 (June 2016)—and countries designated by the Secretary of State as state sponsors of terrorism

(currently Iran, Sudan, and Syria). 8 U.S.C. § 1187(a)(12)(A)(i)-(ii). Congress also authorized the Department of Homeland Security (DHS) to designate additional countries of concern, such as those that are "safe haven[s] for terrorists" or have a "significant presence" of "foreign terrorist organization[s]," *id*. § 1187(a)(12)(D)(i)-(ii); and in February 2016, DHS excluded recent visitors to Libya, Somalia, and Yemen from travel under the Program.[1]

Drawing on these earlier designations by Congress and the Executive, the Order imposes a 90-day suspension of entry of nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen. Order § 2(c). As the Order explains, each country presents "heightened concerns about terrorism and travel to the United States" because it "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." *Id*. § 1(b)(i), (d). The Order details specific concerns regarding each country that may increase the risk that terrorist operatives or sympathizers from those nations will travel to the United States and may "diminish[] the foreign government's willingness or ability" to provide information necessary to detect potential threats. *Id*. § 1(d)-(e).

The President found that continued entry from those countries while the review is ongoing poses an "unacceptably high" "risk" of "erroneously permitting

---

[1] https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

entry" of foreign nationals seeking to do this Nation harm. Order § 1(f). The Order therefore imposes "a temporary pause on the entry of nationals from [those countries]" in order to facilitate a re-assessment of "current screening and vetting procedures." *Id.* §§ 1(f), 2(a)-(b). But the Order excepts from this temporary suspension (among others) lawful permanent residents of the U.S. or aliens who are inside the country on the Order's effective date. *Id.* § 3(a)(i), (b)(i). The Order also provides for case-by-case waivers if a consular officer concludes that "denying entry" to a foreign national otherwise eligible for a visa "during the suspension period would cause undue hardship" and "entry would not pose a threat to national security and would be in the national interest." *Id.* § 3(c). The Order provides illustrative examples where waivers may be appropriate. *Id.*

The President also directed a temporary, 120-day suspension of decisions on applications for refugee status under the U.S. Refugee Admissions Program, and travel of refugees to the United States, in order to allow the Secretary of State to review application and adjudication processes "to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States." Order § 6(a). The refugee program allows aliens who fear persecution on account of race, religion, nationality, or other specified grounds to seek admission, 8 U.S.C. §§ 1101(a)(42), 1157, but the President found that "[t]errorist groups have sought to infiltrate several nations through refugee programs." Order § 1(b)(iii); *see*

*id.* § 1(h) ("[H]undreds of persons born abroad have been convicted of terrorism-related crimes in the United States [including] individuals who first entered the country as refugees.").

During the temporary suspension, individuals may be admitted as refugees "on a case-by-case basis" if the Secretaries of State and Homeland Security determine that their entry "is in the national interest and does not pose a threat to the security or welfare of the United States." Order § 6(c). The temporary suspension does not apply to refugee applicants who were scheduled for transit as of the Order's effective date. *Id.* § 6(a). It also does not apply to individuals granted asylum, refugees already admitted to the United States, or individuals granted withholding of removal under the Convention Against Torture, and it does not limit the right of any individual to seek asylum, withholding of removal, or protection under the Convention Against Torture. *Id.* § 12(e). Finally, the Order limits to 50,000 the number of refugees to be admitted in fiscal year 2017. *Id.* § 6(b).

**2.** The district court's injunction barring enforcement of Sections 2 and 6 of the Order undermines the President's constitutional and statutory duty to protect national security and intrudes on the political branches' constitutional prerogatives. "[N]o governmental interest is more compelling than the security of the Nation," *Haig v. Agee*, 453 U.S. 280, 307 (1981), and "the Government's interest in combating terrorism is an urgent objective of the highest order," *Holder v.*

*Humanitarian Law Project (HLP)*, 561 U.S. 1, 28 (2010). The President's assessment of threats to national security deserves the greatest deference. *Id.* at 33-34. That is particularly true here, because the Order's temporary entry suspension and refugee restrictions reflect the President's "[p]redictive judgment" regarding specific national-security risks. *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988). When the Executive adopts "a preventive measure * * * in the context of international affairs and national security," the government "is not required to conclusively link all the pieces in the puzzle before [courts] grant weight to its empirical conclusions." *HLP*, 561 U.S. at 35.

The Order nevertheless does set forth detailed considerations underlying the President's assessment that national security warrants the review of procedures and the related temporary entry suspension and refugee restrictions. Order § 1(d)-(f), (h)-(i). In so doing, the Order responds to this Court's decision, *Washington*, 847 F.3d at 1168, by further explaining the President's rationale. The district court dismissed the President's assessment as "pretextual," D. Ct. Doc. 219 (TRO), at 36, pointing to extrinsic material that it said "undermines the purported national security rationale" for the Order, D. Ct. Doc. 270 (PI), at 6. The Supreme Court has been clear, however, that courts are "ill equipped" to evaluate the "adequacy" of the Executive's judgments in the areas of foreign affairs and national security. *See Reno*

*v. American-Arab Anti-Discrimination Committee* (*AAADC*), 525 U.S. 471, 491 (1999).

The injunction also threatens the constitutional separation of powers by invalidating an action taken at the height of the President's authority. *See Washington v. Trump*, No. 17-35105, slip op. at 1-3 (9th Cir. Mar. 17, 2017) (Bybee, J., dissenting from denial of rehearing *en banc*) (*Washington* Bybee Dissent). "[T]he President has unique responsibility" over "foreign and military affairs." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993). Rules "concerning the admissibility of aliens" also "implement[] an inherent executive power." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). And because "the President act[ed] pursuant to an express * * * authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)).

For all the foregoing reasons, the district court's injunction overriding the President's national-security judgment imposes irreparable harm on the government and the public. As Chief Justice Roberts recently reiterated in staying an order pending further review, even a single State "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by

representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). *A fortiori*, the injunction against the Order here imposes irreparable injury on the President and the public, given "the singular importance of the President's duties" to the entire Nation, especially when he acts in the national-security context with congressional authorization. *See Nixon v. Fitzgerald*, 457 U.S. 731, 751 (1982); *see also INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (staying injunction because it likely was "not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion by a federal court into the workings of a coordinate branch of the Government"). A stay pending appeal is warranted to prevent this irreparable harm.

### B. A Brief Stay Pending An Expedited Appeal Would Not Impose Any Substantial Harm On These Plaintiffs

Because plaintiffs have identified no imminent, non-speculative, cognizable injury caused by Sections 2 or 6 of the Order, they do not even have standing to sue. But at a minimum, plaintiffs face no substantial harm if the district court's injunction is stayed pending disposition of this expedited appeal.

**1.** The only irreparable harm to plaintiffs that the district court found in entering the injunction was an asserted injury to Dr. Elshikh's alleged Establishment Clause rights. PI 18-19; TRO 40. Dr. Elshikh declared that he is deeply saddened

by the allegedly discriminatory message that the Order conveys about Muslims. D. Ct. Doc. 66-1 ¶¶1, 3. The court "presumed" that this alleged Establishment Clause violation imposes irreparable injury. PI 18; TRO 40 (emphasis omitted).

To the contrary, as this Court has held, that type of "abstract stigmatic injury" resulting from the perception that government conduct turns individuals into "political outsiders" based on their religious affiliation does not even confer Article III standing. *Newdow v. Lefevre*, 598 F.3d 638, 643 (9th Cir. 2010). The Supreme Court has repeatedly emphasized that "the stigmatizing injury often caused by racial [or other invidious] discrimination * * * accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984); *see Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-86 (1982) ("[T]he psychological consequence presumably produced by observation of conduct with which one disagrees" is not the type of "personal injury" that confers Article III standing, "even though the disagreement is phrased in constitutional terms" under the Establishment Clause.).

Dr. Elshikh cannot manufacture standing by "re-characteriz[ing]" his abstract injury from "government *action*" directed against others as personal injury from "a governmental *message* [concerning] religion" directed towards him. *In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008). That approach would "eviscerate

well-settled standing limitations" in cases like *Valley Forge*, *Allen*, and *Newdow*, because it would effectively allow anyone in the country to challenge any federal law on Establishment Clause grounds. *Id.*

**2.** The district court did not base its irreparable-harm determination on any of plaintiffs' other asserted injuries—*i.e.*, that Section 2(c)'s 90-day entry suspension for certain nationals from six countries would impede the entry of Dr. Elshikh's mother-in-law, prospective students and faculty at the University of Hawaii, or potential Hawaiian tourists. The court was right not to rely on those purported injuries.

*First*, even if some or all of them were sufficient to support plaintiffs' standing, *cf.* PI 9-10; TRO 16-27, such temporary delays in entry for aliens abroad lacking substantial connections to this country would not constitute irreparable harm to plaintiffs. *Cf. Washington*, 847 F.3d at 1168-69 (emphasizing the "ample evidence" that the Revoked Order's "travel prohibitions harmed the States' university employees and students, separated families, and stranded the States' residents abroad"). And such delays certainly do not constitute sufficiently substantial harm to outweigh the national-security interests of the government and the public. All of this is underscored in the stay context, where the entry delay would be limited to the duration of this expedited appeal.

*Second*, none of these purported injuries supports plaintiffs' standing because they are not "certainly impending." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1143 (2013). The State's declarations fail to identify any individual with "concrete plans" to come to the University of Hawaii, or to visit as a tourist, during Section 2(c)'s 90-day entry suspension. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992); *see, e.g.*, D. Ct. Doc. 66-2 ¶¶5-8; 66-4 ¶9; 66-6 ¶¶7-8. Moreover, it is "speculative" whether any such individual otherwise would have been eligible for a visa during that period and not received a waiver. *Lujan*, 504 U.S. at 561. The same is true for Dr. Elshikh's mother-in-law. D. Ct. Doc. 66-1 ¶4. And at a minimum, these purported injuries from Section 2(c)'s entry suspension cannot justify standing or injunctive relief against the refugee-related provisions of Section 6 or the internal-review and diplomatic provisions of Sections 2 and 6. *Infra*, pp. 21-22.

**3.** Even if plaintiffs have cognizable harms from the alleged Establishment Clause violation, they lack prudential standing to raise that claim. A plaintiff "generally must assert [its] own legal rights and interests," except in the limited circumstances where it has "third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.3 (2014). Plaintiffs here cannot satisfy the rule or its exception.

As for the exception, Plaintiffs cannot sue on behalf of the third parties who are actually subject to the restrictions in Sections 2(c) and 6: those aliens abroad, who lack any requisite connection to this country, do not themselves possess Establishment Clause rights, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *DKT Mem'l Fund v. Agency for Int'l Dev.*, 887 F.2d 275, 285 (D.C. Cir. 1989), or any constitutional rights regarding entry into this country, *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972); *cf. Washington*, 847 F.3d at 1160, 1165 (allowing States to assert "third party standing" on behalf of aliens who had sufficient connection to this country to possess putative constitutional rights of their own).

As for the rule, plaintiffs cannot sue on their own behalf, because they lack personal rights under the Establishment Clause concerning how the Order treats third-party aliens abroad seeking entry. *See, e.g.*, *McCollum v. California Dep't of Corr. & Rehab.*, 647 F.3d 870, 878-79 (9th Cir. 2011) (holding that a Wiccan chaplain who sued a prison that refused to hire him lacked "prudential standing" under the Establishment Clause because the "claim, at bottom, assert[ed] not his own rights, but those of third party inmates"); *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 207 (6th Cir. 2011) (en banc) (holding that public-school teachers who sued the school district for closing their specialized school and contracting with a private religious school as a replacement lacked "prudential * * * standing" under the Establishment Clause because the claim "d[id] not allege any

infringement of their own religious freedoms," but rather "only economic injury to themselves").

## II. The Government Is Likely To Prevail On The Merits

A stay also is appropriate because defendants are likely to succeed on their appeal of the preliminary injunction. As discussed in the government's opening brief, and for the reasons provided above that plaintiffs have failed to demonstrate imminent, cognizable harm from the Order, the district court erred in finding that plaintiffs' claims are justiciable. The district court further erred in holding that plaintiffs are likely to prevail on their claim that Sections 2 and 6 violate the Establishment Clause.[2]

The Supreme Court has forbidden second-guessing the Executive's exercise of his broad statutory authority regarding exclusion of aliens so long as it is based on a facially legitimate, bona fide reason. *Mandel*, 408 U.S. at 770. The Order, including Sections 2 and 6, goes well beyond that threshold: it is expressly aimed at protecting national security, and it furthers its goal by adopting special safeguards regarding refugees and foreign nationals of six countries that Congress and the Executive previously identified as posing heightened concerns.

[2] The injunction rests solely on the Establishment Clause claim, as the district court declined to reach plaintiffs' other claims that the President lacked statutory authority to issue the Order and that the Order violates due process. TRO 29 n.11; PI 14 n.3.

The district court erroneously declined to apply *Mandel*'s settled test. It misread this Court's stay ruling in *Washington* as holding that *Mandel* was inapplicable to broad pronouncements of immigration policy by the President. PI 15-16. But the *Washington* Court's brief discussion of the plaintiffs' Establishment Clause claim—on which the Court "reserved consideration"—did not address *Mandel* at all. 847 F.3d at 1168. The Court discussed *Mandel* in the context of ruling that the President's Order was judicially *reviewable*. *See id.* at 1162-63. The Court did not address controlling precedent applying *Mandel*'s substantive test to reject constitutional challenges to immigration statutes enacted by Congress. *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787 (1977); *An Na Peng v. Holder*, 673 F.3d 1248, 1258 (9th Cir. 2012).

The district court instead applied Establishment Clause standards from decisions addressing domestic policies about religious displays, local zoning laws, school subsidies, and the like. Those cases should not be applied reflexively to the President's judgments concerning foreign policy, national security, and immigration. *See Washington* Bybee Dissent 8 n.6; *Washington v. Trump*, No. 17-35105, slip op. at 3 n.2 (9th Cir. Mar. 17, 2017) (Kozinski, J., dissenting from denial of rehearing *en banc*).

Plaintiffs' claims nevertheless fail under those inapposite Establishment Clause cases. The "First Amendment mandates governmental neutrality between

religion and religion, and between religion and nonreligion." *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005). The Order is undisputedly facially neutral with respect to religion: it does not mention religion at all, and its explicit objective is to address the risk that potential terrorists might exploit possible weaknesses in the Nation's screening and vetting procedures while the review of those procedures is underway. The district court viewed the fact that Section 2(c)'s entry suspension applies to six countries whose populations are majority-Muslim as undermining its religion-neutral purpose. TRO 31. But Congress and the Executive previously identified those six designated countries for reasons that were not religiously motivated: each "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." Order § 1(d); *see* 8 U.S.C. §§ 1187(a)(12)(A)(i)-(ii), (D)(i)-(ii).

The district court also reasoned that extrinsic material, including principally campaign statements made before the President assumed office and informal remarks of his aides, implies that the entry suspension is intended to target Muslims. TRO 33-36 & n.14. But the court's analysis discrediting an Executive Order's stated purpose—especially based on such unofficial statements—contravenes longstanding Supreme Court precedent. Courts are "ill equipped" to evaluate the "adequacy" and "authenticity" of the Executive's reasons for foreign-affairs and national-security judgments. *AAADC*, 525 U.S. at 491. And the "presumption of

regularity" that attaches to federal action, *see, e.g.*, *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926), counsels strongly against dismissing as insincere the explicit purpose of an order issued by the President of the United States. Moreover, even domestic Establishment Clause case law limits courts to considering "the text, legislative history, and implementation of the statute, or comparable official act," not "judicial psychoanalysis of a drafter's heart of hearts," *McCreary*, 545 U.S. at 862-63 (internal quotation marks omitted).

In all events, the statements on which the district court relied do not demonstrate that Section 2 or 6 was religiously motivated. The statements suggesting a "Muslim ban" bear no resemblance to Section 2, which directs an internal governmental review of screening and vetting procedures, and briefly suspends entry (subject to exceptions and waivers) by nationals from six countries that were previously identified by Congress and the Executive as presenting heightened terrorism concerns. Section 6 is even further afield from any suggestion of improper motivation: it briefly suspends decisions on refugee applications and travel of refugees from *all* countries (also subject to exceptions and waivers) to permit review of the adequacy of procedures in the refugee program, and lowers the annual limit on total refugee entry.

## III. The Nationwide Injunction Is Improper

Even if some preliminary relief were appropriate, a stay pending appeal nevertheless is warranted because the district court's injunction is fatally overbroad. It should be stayed in its entirety until this Court can definitively resolve its validity and scope. At a minimum, the Court should stay the injunction in part for reaching far beyond proper bounds. *U.S. Dep't of Defense v. Meinhold*, 510 U.S. 939 (1993) (staying injunction insofar as it "grant[ed] relief to persons other than" plaintiff).

**A.** The injunction impermissibly enjoins the President himself. It has been settled for 150 years that federal courts generally "ha[ve] no jurisdiction * * * to enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion) (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867)); *id.* at 823-28 (Scalia, J., concurring in part and concurring in the judgment). Any injunction here may run only against federal officials charged with implementing Sections 2 and 6.

**B.** The district court enjoined Sections 2 and 6 on their face, but plaintiffs have fallen far short of carrying their burden of "establish[ing] that no set of circumstances exists under which [those provisions] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). For example, Sections 2 and 6 are clearly lawful as applied to foreign nationals with no close relatives in the country and no other sufficient connection to it; such aliens have no First Amendment rights, and

no person in the U.S. can claim that their exclusion violates the U.S. person's own cognizable rights. *Supra*, pp. 13-15. The district court offered no justification for enjoining the Order's application to persons as to whom it is indisputably valid.

**C.** The injunction's broad sweep—enjoining the application of Sections 2 and 6 in their entirety, and enjoining those provisions as to any person nationwide—also violates the well-settled rule that injunctive relief must be limited to redressing the plaintiff's own cognizable injuries from a violation of the plaintiff's own rights. That rule is required by both the Constitution and traditional principles of equity.

Article III requires that "[t]he remedy" sought must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose * * * —of preventing courts from undertaking tasks assigned to the political branches—if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration." *Id.*; *see City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

Bedrock principles governing equitable remedies independently support the same requirement that injunctions be no broader than "necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). This Court has set aside injunctions that "failed to tailor the

injunction to remedy the specific harm alleged by the actual Appellees." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009); *see, e.g.*, *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("A district court abuses its discretion by issuing an 'overbroad' injunction."); *Meinhold v. U.S. Dep't of Defense*, 34 F.3d 1469, 1480 (9th Cir. 1994) (vacating injunction as to all persons except plaintiff); *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("Injunctive relief * * * must be tailored to remedy the specific harm alleged."). That principle applies with even greater force to a preliminary injunction, an equitable tool designed merely to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The district court's injunction violates this principle in two ways.

**1.** The court erred in enjoining all parts of Sections 2 and 6, without considering whether each part causes any cognizable injury to the plaintiffs. Various subsections of both Sections 2 and 6 immediately affect only the government itself. They direct federal agencies to examine current procedures, to make recommendations and update policies, and to initiate inter-governmental diplomatic

and official communications.[3] Those provisions do not pose any "immediate threatened injury" to Hawaii or to Dr. Elshikh, *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991), and the district court made no finding of irreparable harm that would support enjoining them.

In addition, Section 6's refugee provisions—temporarily suspending the refugee program (§ 6(a)) and adopting a lower annual limit on the number of refugees admitted (§ 6(b))—cause no harm to plaintiffs. Plaintiffs' submissions below did not specifically address Section 6(b)'s refugee limit, and barely addressed Section 6's other provisions. *See* D. Ct. Doc. 228-1, at 4; D. Ct. Doc. 238-1, at 4, 18. And the district court made no finding of any harm attributable to Section 6. Hawaii has not alleged that its university system or tourism revenue is affected by the temporary suspension of the refugee program, and Dr. Elshikh's mother-in-law is not seeking entry as a refugee. TRO 17-21. With no harm to redress, enjoining Section 6 was unwarranted.

**2.** The district court separately erred by enjoining Sections 2 and 6 as to all persons nationwide, rather than limiting the injunction to those persons necessary

[3] *See* Order §§ 2(a)-(b) (DHS must conduct worldwide review of screening procedures and prepare a report), 2(d) (Secretary of State must seek information from foreign governments), 2(e)-(f) (DHS will make recommendations), 2(g) (Secretaries of State and Homeland Security shall submit joint reports), 6(a), (d) (internal review of refugee program application and adjudication procedures, and of coordination with state and local jurisdictions).

to redress plaintiffs' asserted concrete and individualized harms. Any such harms could be redressed by an injunction properly tailored to Dr. Elshikh's mother-in-law and any particular individuals Hawaii could identify whose coverage under a specific provision of the Order cognizably injures Hawaii. Unlike in *Washington*—where the Court concluded that an injunction limited to the States that brought suit would not be "workable" because the Court construed the Revoked Order as applying to lawful permanent residents and others throughout the country, 847 F.3d at 1167—here it would be entirely feasible to tailor injunctive relief to the small number of affected individuals outside the country identified by plaintiffs. A broad injunction prohibiting the government from enforcing Sections 2 and 6 anywhere as to any foreign national—even those with no ties to persons in Hawaii—goes far beyond remedying "the specific harm alleged by the actual [plaintiffs]." *Stormans*, 586 F.3d at 1140.

The district court reasoned that, "because the entirety of the Executive Order runs afoul of the Establishment Clause," it had "no basis to narrow" injunctive relief to provisions that affect the plaintiffs. PI 20-21. That reasoning conflates the scope of the purported legal defect in the Order with the extent of the plaintiffs' alleged injury that an injunction would address. The court cited *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), to support categorical relief, but that case only confirms that the court was required to trace harms from

each provision of the Order to plaintiffs as a predicate for injunctive relief. The Court in *Lukumi* enjoined the city ordinances at issue because each element of the ordinances caused harm to church members' religious exercise. 508 U.S. at 535. The opposite is true here; most of Section 2 of the Order and all of Section 6 have no bearing on any cognizable harms of plaintiffs.

The district court also suggested that the importance of uniform immigration law compelled nationwide relief. PI 20. That is incorrect. Properly limiting any injunctive relief to the individual plaintiffs before the Court would pose no genuine threat to uniformity. To the contrary, proper respect for uniformity requires leaving the Order's nationwide policy in place, with individualized exceptions for particular plaintiffs who have established cognizable, irreparable injury from any likely violation of their own constitutional rights. The Order's severability clause compels the same conclusion. Order § 15(a).

## CONCLUSION

For these reasons, this Court should stay the preliminary injunction pending final disposition of the appeal. At a minimum, if the Court were to conclude that certain plaintiffs have made the requisite showing of cognizable and irreparable injury with respect to particular individuals, the Court should grant a partial stay of the injunction insofar as it extends beyond such individuals.

Respectfully submitted,

/s/ Jeffrey B. Wall

JEFFREY B. WALL
*Acting Solicitor General*

EDWIN S. KNEEDLER
*Deputy Solicitor General*

CHAD A. READLER
*Acting Assistant Attorney General*

ELLIOT ENOKI
*Acting United States Attorney*

AUGUST E. FLENTJE
*Special Counsel to the Assistant Attorney General*

DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
ANNE MURPHY
*Attorneys, Appellate Staff*
*Civil Division, Room 7241*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

APRIL 2017

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) and Circuit Rule 32-3(2). This motion contains 5591 words, excluding the parts of the motion excluded by Fed. R. App. P. 27(d)(2) and 32(f).

/s/ Sharon Swingle
Sharon Swingle

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2017, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Sharon Swingle
Sharon Swingle